

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JAN – 4 2001

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| JAMAL ELHAJ-CHEHADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| V. | ) | Civil No. 3:99-CV-0680-BC |
| | ) | |
| EDUCATIONAL COMMISSION FOR | ) | |
| FOREIGN MEDICAL GRADUATES, | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED ON

**JAN – 5 2001**

U.S. DISTRICT CLERK'S OFFICE

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's **Motion for Summary Judgment**, filed July 21, 2000. Having

reviewed the pertinent pleadings and the evidence submitted therewith, the motion is **GRANTED**

for the reasons that follow.

## I. Background[1]

Plaintiff Dr. Jamal Elhaj-Chehade ("Chehade") is a graduate of a foreign medical school

located in Romania. Defendant Educational Commission for Foreign Medical Graduates

("ECFMG") is a non-profit organization which, through its certification program, assesses whether

graduates of foreign medical schools are ready to enter residency or fellowship programs in the United

States that are accredited by the Accreditation Council of Graduate Medical Examination. **Def.'s**

**Brief in Support of Mot. for Summ. J. ("Def.'s Br.") at ¶ 1.** In sum, by giving its certification to

foreign medical school graduates, the ECFMG assures directors of accredited residency and

---

[1] The following background facts are taken from the Defendant's brief in support of its motion for summary judgment, filed July 21, 2000, the Plaintiff's Complaint, filed March 29, 1999, his Complaint and Personal Statement, filed May 24, 1999, his response to the undersigned's questionnaire, filed August 30, 1999, and "Plaintiff's notice of motion to amend the complaints against the defendants - April 21-2000," filed April 24, 2000, which this Court has construed as an amended complaint. Unless characterized as a contention by either party, these facts are undisputed.

fellowship programs, and the people of the United States, that the graduates have met minimum standards of eligibility required to enter these programs. **Id. at ¶ 3.** To be eligible for ECFMG certification, foreign medical school graduates must (1) pass a series of exams and (2) provide ECFMG with copies of a medical diploma that must be verified independently by the medical school to ECFMG. **Id. at ¶ 8.** The primary reason for independent verification of medical school completion is to ensure that medical diplomas are authentic. **Id.**

The testing process for ECFMG certification requires the foreign graduate to have passing grades in examinations designed to assess basic medical science knowledge, clinical science knowledge and command of the English language. **Id. at ¶ 9.** Once the candidate passes the basic medical science and clinical science examinations within the 7-year time limit required for ECFMG certification, these exams do not need to be repeated for ECFMG certification, although individual state licensing requirements may differ. **Id.** The English test, however, is valid for only two years for the purpose of entry into a residency program. **Id.** Thus, if the candidate does not enter an accredited residency program in the United States within two years of passing the English exam, it must be passed again before the applicant is eligible to enter a residency program. **Id.**

With respect to the verification of an applicant's credentials, the ECFMG verifies the diploma with the appropriate officials of the foreign medical school that issued the diploma by submitting a formal request for verification to the school. **Id. at ¶ 10.** This verification requirement is satisfied once the ECFMG receives the verification directly from the medical school. **Id.** In certain limited circumstances, when the foreign medical school does not respond to the ECFMG's request, ECFMG policy permits an alternate verification process. **Id. at ¶ 20.** In these instances, the ECFMG will consider sworn attestations from three physicians who were fellow students or faculty members at the

2

candidate's medical school, or who had other personal knowledge that the candidate attended the specified medical school and graduated with a Doctor of Medicine or equivalent medical degree. **Id.**

Chehade graduated from medical school in Romania in 1983. **Pl.'s Resp. to Magistrate's Questionnaire, filed Aug. 30, 1999 at 21; Def.'s Appendix in Support of Mot. for Summ. J. ("Def.'s App.") at 50.** On March 1, 1985, he submitted his application to take the basic medical science, clinical science, and English examinations necessary for ECFMG certification. **Def.'s Br. at ¶ 14.** In August of 1986, the ECFMG sent Chehade's diploma to his Romanian medical school for verification. **Id. at ¶ 16.** Over the next few years, after numerous attempts, Chehade passed each of the examinations required for ECFMG certification - the English exam in or about July 1987, the clinical science exam in or about July 1988, and the basic medical science exam in or about January 1989. **Id. at ¶ 15.** During this time period, however, the ECFMG could not obtain verification of Chehade's diploma through his Romanian medical school. Thus, on March 21, 1989, the ECFMG notified Chehade that, although he passed all the required examinations for ECFMG certification, he was ineligible for an ECFMG certificate. **Id. at ¶ 18.**

According to the ECFMG, they attempted to verify Chehade's diploma  in August of 1986, but they received no response from his medical school. **Id. at ¶ 19.** In November of 1987 and again in June of 1989, following its alternative procedure for verification, the ECFMG sent to Chehade the attestation forms for three of his medical school colleagues to verify his credentials. **Id. at ¶ 21.** But at no point did Chehade return three affidavits to the ECFMG. **Id.** On April 21, 1989, the ECFMG sent another request for verification to Chehade's medical school, but again, they received no response. **Id. at ¶ 22.**

In June of 1989, the ECFMG advised Chehade of an alternate method to request verification

3

of his diploma through the U.S. Embassy in Romania. **Id. at ¶ 23.** In August of 1989, the ECFMG

sent a verification request to the U.S. Embassy in Bucharest, Romania for six candidates, including

Chehade, who had attended three different medical schools in Romania. **Id. at ¶ 24.** Finally, in July

of 1990, the ECFMG received verification of Chehade's medical diploma from his medical school

through the U.S. Embassy.[2] **Id. at ¶¶ 24, 33.**

On August 7, 1990, the ECFMG issued Chehade a "Letter of Certification" signifying that

he had completed all of the requirements for certification. **Id. at ¶ 37; Def.'s App. at 53.** However,

the letter specified that it was effective only through July of 1990, the expiration date of Chehade's

most recent passing English examination score. **Id. at ¶ 37; Def.'s App. at 53.** According to the

ECFMG, the results of Chehade's July 1990 English exam, which he passed, were not yet available

and were not reported to him until September 12, 1990. **Id. at ¶ 37.** Chehade's official Standard

ECFMG Certificate issued by the ECFMG on October 31, 1990 did not reflect that Chehade had

passed the July 1990 English exam because, the ECFMG claims, Chehade never contacted them to

have his certificate updated to extend its validity date.[3] **Id.** In any event, for whatever reason,

Chehade did not gain entry into any residency programs for which he was eligible.

In July of 1993, Chehade left the United States when his temporary immigration visa was not

renewed. **Id. at ¶ 41; Def.'s App. at 72-73.** Chehade lived in Lebanon from July 1993 through

---

[2] In a letter to Chehade dated July 16, 1990, the U.S. State Department advised him that a request for verification of medical credentials, even when made through the U.S. Embassy, often involved a considerable delay in the response from the Romanian authorities. **See Def.'s App. at 58.**

[3] In his pleadings, Chehade complains about receiving this "expired" ECFMG certificate which he alleges was issued intentionally by the ECFMG and which also conveys a special message or code designed to prevent him from securing a residency position. **See Pl.'s Compl. and Personal Statement, filed May 24, 1999 at 1 and Pl.'s Resp. to Magistrate's Questionnaire at 9-10.**

4

September 1996, at which time he returned to the United States under permanent resident status. **Id. at ¶ 41; Def.'s App. at 74-75.** While he was out of the country, between 1993 and 1996, Chehade allowed his ECFMG English test validation to lapse. **Id. at ¶ 42.** Consequently, without a current passing grade on the English exam, Chehade was ineligible for entry into any accredited residency programs upon his return to the United States in 1996. **Id.** To re-validate his ECFMG certification, Chehade took and passed the TOEFL (Test of English as a Foreign Language) exam in January of 1997, which is an alternative exam sufficient for ECFMG certification that, according to Chehade, he took to expedite the re-validation process. **Id.; Pl.'s Resp. to Magistrate's Questionnaire at 15-17.** He also passed the ECFMG English examination in March of 1997. **Def.'s Br. at ¶ 42.**

On March 18, 1997, the ECFMG received notification that Chehade had passed the January 1997 TOEFL exam. **Id. at ¶ 43; Def.'s App. at 56.** Approximately one week later, on March 24, 1997, the ECFMG also received a letter from Chehade requesting that they send him a re-validation sticker based on his passing TOEFL score. **Id.; Def.'s App. at 57.** The ECFMG contends that they sent him a re-validation sticker that same day, but Chehade denies receiving it. **Id.; Def.'s App. at 57; Pl.'s Resp. to Magisrate's Questionnaire at 3, 15-16.** In a letter dated April 23, 1997, the ECFMG advised Chehade that he also passed the March 1997 ECFMG English exam and attached a re-validation sticker to the letter. **Def.'s Reply at 18; Def.'s Supplemental App. at 3 (¶ 7); Pl.'s Resp. to Magistrate's Questionnaire at Ex. 8 (p. 3).** Chehade claims that he did not receive the re-validation sticker until May of 1997. **Pl.'s Resp. to Magistrate's Questionnaire at 3, 15.**

Because of Chehade's passing score on the March 1997 ECFMG English exam, his ECFMG certification was valid for purposes of entry into a residency program through March of 1999. **See**

**Def.'s App. at 55.** Nevertheless, despite submitting hundreds of applications across the United States, Chehade was not offered any position in an accredited medical residency program. **Def.'s Br. at ¶ 44; Def.'s App. at 76-79.**

On March 29, 1999, acting *pro se*, Chehade brought this lawsuit against the ECFMG. He alleges a myriad of causes of action which, in essence, have one common theme - he blames the ECFMG for the delays in obtaining and re-validating his certification and accuses them of interfering with his ability to secure a position in a medical residency program in the United States. The ECFMG's actions, Chehade maintains, have effectively denied him the opportunity to practice medicine in this country. Construing all of Chehade's pleadings liberally, the Court can discern ten separate causes of action against the ECFMG. They are (1) negligence; (2) breach of contract; (3) defamation; (4) civil conspiracy; (5) intentional infliction of emotional distress; (6) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (7) discrimination and retaliation; (8) due process violations; (9) antitrust violations; and (10) Constitutional claims for slavery and violation of Titles VI and IX. Chehade asks for $20,000,000 in actual damages and $75,000,000 in punitive damages. **Pl.'s Am. Compl., filed Apr. 24, 1999 at unnumbered 3.**

On September 8, 2000, the ECFMG filed the instant motion for summary judgment, contending that Chehade's claims are barred by the applicable statute of limitations and that he has failed to establish at least one essential element for each of his claims. **Def.'s Mot. at ¶ 1.** Chehade filed his response on September 25, 2000, and on October 11, 2000, the ECFMG filed its reply. As part of its reply, the ECFMG moved to strike Chehade's response and the accompanying attachments on the grounds that they do not comply with the local rules of this district. **Def.'s Reply at 5-6.** The ECFMG also objected to the attachments to Chehade's response, complaining that they constitute

improper summary judgment proof. **Id. at 6-9.** Before turning to the merits of the motion to strike and the motion for summary judgment, the Court will review the standards governing its analysis.

## II. Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.,* 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the movant for summary judgment need not support the motion with evidence negating the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the non-movant's case. *Id.; Little,* 37 F.3d at 1075.

Once the movant makes this showing, the burden shifts to the non-movant to show that summary judgment is not appropriate. *Little,* 37 F.3d at 1075 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2553-54 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita,* 475 U.S. at 587, 106 S. Ct. at 1356 (*quoting* FED. R. CIV. P. 56(e)). In determining whether a

7

genuine issue for trial exists, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The Court turns first to discuss the ECFMG's motion to strike, then to its summary judgment motion.

## III. Analysis

### A. The ECFMG's Motion to Strike

In its summary judgment reply, the ECFMG objects to Chehade's response and moves to strike it in its entirety, alleging that it fails to comply with this district's local rules and that it impermissibly relies on inadmissible summary judgment evidence. **Def.'s Reply at 4-9.**

All of the attachments to Chehade's response are unsworn. Additionally, the attachments of which the ECFMG complains contain handwritten alterations and include incomplete excerpts from depositions which, according to the ECFMG, were not even taken in this case. **Def.'s Reply at 7-8; See Pl.'s Resp. at attachments "App" 200, 203, 205, 207-208, 210-211, 222, 225-226.** Chehade also includes unauthenticated printouts from various internet websites which contain numerous inadmissible hearsay statements. **See Pl.'s Resp. at attachments "App" 205-209, 220-223.**

Under Fed. R. Civ. P. 56, a district court may consider only admissible evidence in ruling on a summary judgment motion. **See Fed. R. Civ. P. 56;** *Mersch v. City of Dallas, Texas*, 207 F.3d 732, 734-35 (5th Cir. 2000). The Fifth Circuit has consistently rejected attempts to defeat motions for summary judgment with improper documents. *Hicks v. Brysch*, 989 F. Supp. 797, 810 & n.65 **(W.D. Tex. 1997) (collecting cases).** Moreover, "although *pro se* litigants are not held to the same

8

standards of compliance with formal or technical pleading rules applied to attorneys, [the Fifth Circuit has] never allowed such litigants to oppose summary judgments by the use of unsworn materials." *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980); *Hicks,* 989 F. Supp. at 809-10 (citations omitted).

Clearly, the unsworn attachments to Chehade's summary judgment response do not constitute competent, admissible summary judgment proof.  Consequently, the Court need not consider them in resolving the ECFMG's summary judgment motion.  Nevertheless, as will be explained more fully below, taking these attachments into consideration does not change the result in this case that summary judgment in favor of the ECFMG is warranted.  Furthermore, Chehade's answers to the undersigned's questionnaire filed on August 30, 1999, sworn to under penalty of perjury and referenced in his response, do constitute proper summary judgment evidence. *See Bookman v. Shubzda,* 945 F. Supp. 999, 1003 (N.D. Tex. 1996).  For these reasons, the Court declines to strike Chehade's response or his attachments.  The merits of the ECFMG's summary judgment motion is next.

### B. The ECFMG's Motion for Summary Judgment

The ECFMG contends that summary judgment is proper on each of Chehade's claims because (1) they are barred by the applicable statute of limitations; and (2) Chehade cannot establish at least one essential element for each of his claims. **Def.'s Mot. at ¶ 1.**

As briefly noted earlier, despite bringing ten separate causes of action against the ECFMG, Chehade's claims center chiefly around the delays in obtaining and re-validating his ECFMG certification and his resulting inability to gain entry into an accredited medical residency program, for which he blames the ECFMG.  More specifically, he complains that while he submitted his

application for ECFMG certification in 1985, it took the ECFMG five years to verify his credentials and to complete the certification, a process which he claims should only take three to six months. **Pl.'s Compl. and Personal Statement, filed May 24, 1999 at 1; Pl.'s Resp. to Magistrate's Questionnaire at 3-5, 8-9, 19.** He also complains about the 2-month delay in receiving his re-validation sticker from the ECFMG in 1997. **Pl.'s Resp. to Magistrate's Questionnaire at 3, 15.** These delays, according to Chehade, cost him many available opportunities to enroll into a residency program. **Pl.'s Resp. to Magistrate's Questionnaire at 13, 15, 17; Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") at 2-3 (¶ 18), 17-18 (¶ 36).** He further alleges that the ECFMG intentionally issued him an expired certificate in 1990 which, he claims, also conveys some sort of secret messages or codes to residency programs. **Pl.'s Resp. to Magistrate's Questionnaire at 9-10, 18.** In short, Chehade claims that because he was not offered any residency positions, the ECFMG must have in some way caused the residency programs to deny his application for a residency position. **Id. at 18, 20.**

The ECFMG first maintains that all of Chehade's claims, to the extent they arise from its conduct during the certification process from 1985 through 1990, are time-barred. **Def.'s Br. at 18-24.** The Court agrees.

### 1. Applicability of Statute of Limitations

The applicable statute of limitations for each of Chehade's claims ranges from one year to four years.[4]  Chehade filed his complaint on March 29, 1999, thus under the maximum limitations

---

[4] Chehade's defamation claim has a 1-year limitations period. *Roe v. Walls Reg'l Hosp., Inc.,* 21 S.W.3d 647, 651 (Tex. App. – Waco 2000, no pet.). His claims for negligence, civil conspiracy, intentional infliction of emotional distress, due process violations, discrimination, retaliation, and Constitutional violations each carry a 2-year limitations period. *Am. Centennial Ins. Co. v. Canal Ins.*

period, any claims based on the ECFMG's conduct before March 29, 1995 would ordinarily be time-barred. In his Complaint and Personal Statement filed May 24, 1999, Chehade accused the ECFMG of negligence and of "not following the proper procedures" in 1989 when it allegedly refused to certify Chehade in a timely manner even though he had passed the required examinations by January of 1989. **Pl.'s Compl. and Personal Statement, filed May 24, 1999 at 1.** The ECFMG has also offered competent, uncontroverted summary judgment proof that, in 1990, Chehade criticized the ECFMG's handling of the certification process in correspondence directed to the ECFMG, to Senator Phil Gramm, to The Dallas Morning News, and to Congressman John Bryant. **Def.'s App. at 34, 36-37, 44, 46, 48.** In particular, in his letter received by the ECFMG in April of 1990, Chehade stated that he would not tolerate being discriminated against, and that the ECFMG should realize the harm caused to him by its attitude of "[i]ndifference or I don't give a damn." **Id. at 37.** In May of 1990, Chehade complained to the Dallas Morning News that he had been discriminated against by the ECFMG and criticized "their negligent manner which not only discriminate against me but also resulted in costing me heavily in time, money and loosing [sic] many opportunities I might not get in the future." **Id. at 44.** In a 1990 follow-up letter to The Dallas Morning News, Chehade

---

Co., 810 S.W.2d 246, 255 (Tex. App. – Houston [1st Dist.] 1991, *aff'd in part, rev'd in part on other grounds,* 843 S.W.2d 480 (Tex. 1992) (negligence); *Stevenson v. Koutzarov,* 795 S.W.2d 313, 318 (Tex. App. – Houston [1st Dist.] 1990, writ denied) (civil conspiracy); *Muckelroy v. Richardson Indep. Sch. Dist.,* 884 S.W.2d 825, 829 (Tex. App. – Dallas 1994, writ denied) (intentional infliction of emotional distress); Tex. Civ. Prac. & Rem Code Ann. § 16.003 (Vernon 1990) (due process violations, discrimination, retaliation, Constitutional violations); *Porter v. Charter Med. Corp.,* 957 F. Supp. 1427, 1434 (N.D. Tex. 1997) (§ 1983 claims are subject to Texas' two-year limitations period for personal injury). His claims for breach of contract, antitrust violations, and RICO violations have a 4-year limitations period. *Ingersoll-Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 210 (Tex. 1999) (op. on reh'g) (breach of contract); 15 U.S.C. § 15b (West 1997) (antitrust claim under Clayton Act); *Porter,* 957 F. Supp. at 1434 (RICO).

expressed his feeling that the ECFMG was "waging psychological and economical warfare" against him, that he was "defamated" as a result, and that he was paying a heavy price due to the ECFMG's "incompetence, negligence and red tape." **Id. at 46.** Significantly, he also mentioned that he was contemplating a lawsuit against the ECFMG and was currently seeking a lawyer. **Id.** Chehade made similar remarks in his 1990 letter to Congressman Bryant. **Id. at 48.**

Clearly then, as early as 1990, Chehade believed that he had been wronged by the ECFMG at least with respect to the delay in the certification process and, by his own admission, considered bringing a lawsuit against them at that time. But Chehade did not bring this suit until nine years later on March 29, 1999. In response to the ECFMG's limitations claim, Chehade asserts that he could not have filed this suit in 1989 or 1990 because he did not have any proof of the ECFMG's alleged wrongdoing, and that his statements in his 1990 letters were only emotional, reactive and speculative. **Pl.'s Resp. at 2 (¶ 8).** As the ECFMG correctly notes, however, the issue here is not when proof of Chehade's allegations allegedly became available, but rather, for limitations purposes, when his causes of action accrued; i.e. when the ECFMG's alleged wrongful conduct caused him a legal injury. *See Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex. 1990). Based on the allegations in his complaint and in his 1990 correspondence, the Court finds that Chehade's causes of action, to the extent they arise from the certification process, accrued in or around 1990 and, therefore, must have been brought well before 1999.

Chehade also counters in his response that none of his claims are barred because the ECFMG's wrongful conduct, and his resulting injury, continued from 1997 through the present. **Pl.'s Resp. at 1-2 (¶6), 4 (¶¶ 13, 14), 7 (¶ 1).** An exception to the limitations doctrine exists for so-called "continuing torts." *First General Realty Corp. v. Maryland Cas. Co.,* 981 S.W.2d 495, 501

12

(Tex. App. – Austin 1998, pet. denied). A continuing tort is one inflicted over a period of time. *Id.* It is repeated until ceased and involves not only continuing wrongful conduct, but continuing injury as well. *Upjohn Co. v. Freeman,* 885 S.W.2d 538, 542 (Tex. App. – Dallas 1994, writ denied). A continuing tort case does not involve acts that are complete in themselves, thus a cause of action based on a continuing tort does not accrue until the defendant's continual tortious conduct stops. *Twyman v. Twyman,* 790 S.W.2d 819, 821 (Tex. App. – Austin 1990), *rev'd on other grounds,* 855 S.W.2d 619 (Tex. 1993); *See Procter & Gamble Co. v. Amway Corp.,* 80 F. Supp.2d 639, 652-53 (S.D. Tex. 1999).

Chehade's reliance on the "continuing tort" theory is misplaced. First, as discussed earlier, his pleadings in this case and his 1990 letters to the ECFMG, Senator Gramm, Congressman Bryant and The Dallas Morning News distinctly express his complaints about the ECFMG's alleged dilatory conduct in verifying his medical credentials from Romania and the alleged injury resulting therefrom. In 1990, the ECFMG issued Chehade his ECFMG certificate which he claims was expired. In any event, Chehade was unable to secure any residency position. Even assuming that the ECFMG engaged in some tortious conduct by delaying Chehade's certification and by issuing him an expired certificate, these acts are wholly dissimilar and completely separable from each other and from any tortious conduct allegedly committed by the ECFMG in 1997 through the present. Hence, the continuing tort doctrine has no applicability in this instance. *See Twyman,* 790 S.W.2d at 821; *Procter & Gamble,* 80 F. Supp.2d at 652-53.

Moreover, and perhaps more importantly, it is undisputed that Chehade left the United States in July of 1993, when his temporary immigration visa was not renewed. **Def.'s Br. at ¶ 41; Def.'s App. at 72-73.** He lived in Lebanon from July 1993 through September 1996, at which time he

13

returned to the United States under permanent resident status. **Id. at ¶ 41; Def.'s App. at 74-75.** There is no competent evidence in the record that, during Chehade's absence, he maintained any contact with the ECFMG or that the ECFMG engaged in any unlawful conduct against him. In fact, Chehade has failed to controvert the ECFMG's proof that while he was out of the country, between 1993 and 1996, he allowed his ECFMG English test validation to lapse thereby making him ineligible for entry into any accredited residency programs upon his return to the United States. **See Id. at ¶ 42.** While Chehade claims that the ECFMG's unlawful conduct has continued from 1997 through the present, which the Court will address in more detail below, he has simply failed to show any continuing course of unlawful conduct so as to avail himself of the continuing tort theory. Moreover, Chehade has failed to provide any competent evidence raising a genuine fact issue as to whether the statute of limitations should be tolled for each of his causes of action. Accordingly, the Court finds that Chehade's causes of action, to the extent they are based on the ECFMG's conduct during the certification process through 1990 are time-barred and, consequently, the ECFMG is entitled to summary judgment.

This does not end the Court's inquiry, however, because as previously noted, Chehade accuses the ECFMG of wrongdoing following his return to the United States. Because Chehade's claims arising from the ECFMG's conduct in connection with his certification are barred by limitations, the Court's focus turns to the relevant factual background following Chehade's return to the United States in 1996. Additionally, since it is unclear from Chehade's pleadings precisely when the ECFMG's alleged misconduct occurred during this time period, the Court will assume that it falls within the applicable limitations period for each of Chehade's claims. Nevertheless, the ECFMG also moves for summary judgment on the ground that, even assuming Chehade's claims are

not time-barred, he cannot establish at least one essential element for each of his claims.

### 2. Chehade's Failure to Establish Essential Elements of His Claims

Chehade's allegations against the ECFMG following his return to the United States in 1996 center around the re-validation of his ECFMG certificate in 1997 and his subsequent attempts to secure a residency position. As noted in the preceding section, the undisputed evidence establishes that while Chehade was out of the country from 1993 through 1996, he allowed his ECFMG English test validation to expire. Thus, in order to be accepted into a residency program, Chehade needed to re-take and pass the English exam.

In January and March of 1997, respectively, Chehade passed the TOEFL English exam and the ECFMG English exam. **Def.'s Br. at ¶ 42; See Def.'s Reply at 18.** Although the ECFMG alleges that they sent Chehade a re-validation sticker in March of 1997 based on his passing TOEFL score, he denies receiving it. **See Def.'s Br. at ¶ 43; Def.'s App. at 57; Pl.'s Resp. at 20-21; Pl.'s Resp. to Magistrate's Questionnaire at 3, 15-16.** At any rate, in a letter dated April 23, 1997, the ECFMG advised Chehade that he passed the March ECFMG English exam and attached a re-validation sticker to the letter. **Def.'s Reply at 18; Def.'s Supplemental App. at 3 (¶ 7); Pl.'s Resp. to Magistrate's Questionnaire at Ex. 8 (p. 3).** Chehade claims that he did not receive his revalidation sticker until May of 1997. **Pl.'s Resp. to Magistrate's Questionnaire at 3, 15.**

Chehade contends that this 2-month delay in receiving his re-validation sticker, deliberately caused by the ECFMG, effectively prevented him from obtaining any residency positions for that year. **Pl.'s Resp. at 2-3 (¶ 18), 17-18 (¶ 36); Pl.'s Resp. to Magistrate's Questionnaire at 15, 17.** He also accuses the ECFMG of interfering with his ability to gain entry into a residency program following the re-validation of his certificate. In very vague terms, he appears to claim that residency

programs to which he applied contacted the ECFMG to verify his certification, and because he was not offered any residency position, the ECFMG must have in some way, including through the use of secretly coded certificate, caused his residency application to be denied. **Pl.'s Resp. at 8-9 (¶¶ 6-7), 10 (¶ 10), 16 (¶ 29); Pl.'s Resp. to Magistrate's Questionnaire at 9-10, 18, 20.** With respect to a specific position held by Chehade at the University of Texas Southwestern Medical School at Dallas ("UTSW"),[5] he maintains that the ECFMG collaborated and conspired with UTSW to remove him from that position and to deny him acceptance into their residency program. **Pl.'s Resp. at 3 (¶ 9), 5, 8-9 (¶ 6), 10 (¶ 12); Pl.'s Resp. to Magistrate's Questionnaire at 13, 20.**

The ECFMG moves for summary judgment on each of Chehade's claims, contending that he cannot establish at least one essential element for each claim. **Def.'s Mot. at ¶ 1.** The Court will address Chehade's claims in turn.

### 1. Negligence

For his negligence cause of action against the ECFMG under Texas law, Chehade must establish (1) a legal duty; (2) breach of that duty; and (3) damages proximately resulting from the breach. *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998). The ECFMG contends that Chehade can show neither the breach of any duty nor damages proximately caused by that breach. **Def.'s Br. at 24-27.** The Court agrees.

The ECFMG breaches a duty to Chehade if it does something an ordinarily prudent person exercising ordinary care would not have done under those circumstances, or if it fails to do that which an ordinarily prudent person would have done in the exercise of ordinary care. *Lincoln Prop.*

---

[5] It is unclear from the record what position Chehade had with UTSW, but it was not a residency position as he was denied entry into their residency program.

*Co. v. DeShazo,* 4 S.W.3d 55, 61 (Tex. App. – Fort Worth 1999, pet. denied). The ECFMG has offered competent, uncontroverted evidence that while Chehade was outside the United States from 1993 through 1996, he allowed his English test validation to lapse, and therefore, he was ineligible to enter into a residency program until it was re-validated. **Def.'s App. at 12 (¶ 42).** Chehade passed the TOEFL and ECFMG English exams in early 1997, and the evidence shows that within one week of receiving Chehade's TOEFL score in March of 1997, the ECFMG sent him a re-validation sticker. **Id. at 12-13 (¶ 43); Def.'s App. at 56-57).** Viewing the evidence in the light most favorable to Chehade, the Court will assume, as he alleges, that he did not receive this sticker. Nonetheless, it is undisputed that in late April of 1997, the ECFMG sent him another re-validation sticker for passing the ECFMG English exam as well, which Chehade received in May. **See Pl.'s Resp. to Magistrate's Questionnaire at 15-17 & Ex. 8 (p. 3).** Despite Chehade's complaints about the 2-month dely in receiving his re-validation sticker, the Court finds, as a matter of law, that the ECFMG did not breach any duty to Chehade by acting or failing to act as an ordinary prudent person would have under similar circumstances. Moreover, Chehade has identified no competent evidence in the record that the ECFMG engaged in other negligent conduct following the re-validation of his certificate.

Even assuming the ECFMG breached a duty to Chehade, he has failed to produce any evidence that he was damaged by such act or omission. The ECFMG has offered proof that it has no control over the admissions process into medical residency programs, that it never promised Chehade any assistance in finding such a position, and that he acknowledged during his deposition that no one guaranteed him a job. **Def.'s App. at 4-5 (¶¶ 13-15), 13-14 (¶¶ 44, 50), 80.** Chehade provides no competent evidence to the contrary. Rather, the record contains only his

17

unsubstantiated allegations that the he was unable to obtain a residency position due to the ECFMG's conduct. Chehade's unsupported assertions cannot satisfy his burden as the non-movant to raise a genuine fact issue for trial so as to withstand summary judgment. *See Little,* 37 F.3d at 1075; *See also Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir. 1996) ("In short, conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden.") (citation omitted). And although Chehade's *pro se* response must be construed liberally, he is not, as the party with the burden or proof, excused from his obligation under summary judgment principles to set forth specific facts supporting his claims. *Bookman,* 945 F. Supp. at 1004. In short, the evidence in the record is simply insufficient to raise a genuine fact issue as to whether Chehade was denied a residency position or otherwise damaged due to the negligent conduct of the ECFMG. Accordingly, summary judgment on this claim is proper.

### 2. Breach of Contract

Chehade alleges in his pleadings that he has contract for life with the ECFMG, and that their conduct breached that contract. **Pl.'s Resp. at Magistrate's Questionnaire at 22; Pl.'s Resp. at 7 (¶ 2), 11 (¶ 16).** He claims that the contract is an implied one which arose he when submitted his initial application for certification to the ECFMG. **Id.**

A breach of contract claim has three elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *Prudential Sec., Inc. v. Haugland,* 973 S.W.2d 394, 396 (Tex. App. – El Paso 1998, pet. denied). Chehade offers no competent evidence showing the existence of any contract with the ECFMG nor any legal basis for finding the

existence of one, either express or implied. This claim, therefore, is wholly without merit.

### 3. Defamation

The factual underpinnings for Chehade's defamation claim are not entirely clear. The only conduct which the Court can discern that could form the basis of a defamation claim are Chehade's allegations that because he was not offered any residency positions, the ECFMG must have communicated in some way with the residency programs to cause them to reject his application. **Pl.'s Resp. at 8-9 (¶¶ 6-7), 10 (¶ 10); Pl.'s Resp. to Magistrate's Questionnaire at 18, 20.** In this regard, he speculates that his ECFMG certificate contained secretly-coded messages which caused residency programs to deny his application. **Pl.'s Resp. to Magistrate's Questionnaire at 9-10, 18.**

To maintain a defamation cause of action under Texas law, Chehade must prove that the ECFMG: (1) published a statement; (2) that was defamatory concerning him; and (3) while acting with negligence regarding the truth fo the statement. *See WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998). Generally, a claim for defamation takes the form of either libel or slander. *See generally Simmons v. Ware,* 920 S.W.2d 438, 443-44 (Tex. App. – Amarillo 1996, no writ). Slander has been defined as an orally communicated or published defamatory statement made to a third person without legal excuse. *Id.* Libel, on the other hand, is a defamatory statement in written or other graphic form, which tends to injure a person's reputation or impeach a person's honesty, integrity, virtue, or reputation and thereby expose him to public hatred, ridicule, or financial injury. *Dolcefino v. Randolph,* 19 S.W.3d 906, 917 (Tex. App. – Houston [14th Dist.] 2000, no pet.). "In both libel and slander the issues are whether the utterance was made, if it was false, if it damaged the complainant and if the speaker had any privilege." *Peshak v. Greer,* 13 S.W.3d 421, 426 (Tex. App. – Corpus Christi 2000, no pet.).

The ECFMG maintains that it did not publish any defamatory material to a third party. **Def.'s Br. at 28-29.** Evidence proffered by the ECFMG establishes that it did not send or publish any false correspondence concerning Chehade to any third party, and that the only written documentation in this case pertains to his test scores and the status of his certification, which are indisputably accurate and true. **Def.'s App. at 13 (¶ 46), 16-23, 52-55.** Despite his allegations to the contrary, Chehade offers no competent summary judgment proof to substantiate his claims that the ECFMG certificate is secretly coded or that the ECFMG otherwise made any false and defamatory statements to some third party. The ECFMG's uncontroverted proof further demonstrates that they had no knowledge of any residency applications submitted by Chehade nor any record of an inquiry from a residency program concerning his certification. **Def.'s App. at 11-12 (*Kelly* Aff. at ¶¶ 39-41).** Absent some evidence that the ECFMG published, in written or oral form, any false information about Chehade, summary judgment is warranted on this claim.

### 4. Civil Conspiracy

Chehade also accuses the ECFMG of collaborating and conspiring with UTSW to deny him a position in their residency program. **Pl.'s Resp. at 3 (¶ 9), 5, 8-9 (¶ 6), 10 (¶ 12); Pl.'s Resp. to Magistrate's Questionnaire at 13, 20.**

"An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey v. Armco Steel Co.*, **652 S.W.2d 932, 934 (Tex. 1983).** The elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Id.*

The ECFMG offers evidence that it has no record of any contact with any school or residency

program concerning Chehade's residency application, nor did it participate in the decision of any program to deny his application. **Def.'s App. at 11 (¶ 39), 12 (¶ 41).**  Chehade himself acknowledged at his deposition that he had no documentation of a cover-up or conspiracy between the ECFMG and UTSW. **Def.'s App. at 81-82.**  While he maintains in his summary judgment response that evidence of a conspiracy exists, see Pl.'s Resp. at 3 (¶¶ 9, 12), he submitted none of that evidence to the Court.  Instead, he asserts that a mere association between the ECFMG and UTSW is enough to create an inference of conspiracy. **Pl.'s Resp. at 3 (¶ 12), 10 (¶ 12).**  The Court disagrees.  Again, Chehade's unsubstantiated and conclusory assertions of a conspiracy are insufficient to meet his burden to raise a genuine fact issue for trial. *See Little,* 37 F.3d at 1075; *Douglass,* 79 F.3d at 1429.  With no evidence of an agreement between the ECFMG and UTSW and some overt, unlawful act, summary judgment is proper on Chehade's conspiracy claim.

### 5. Intentional Infliction of Emotional Distress

Chehade also claims that the ECFMG's conduct has caused him considerable health problems including emotional and non-emotional distress. **Pl.'s Resp. to Magistrate's Questionnaire at 6.** As part of his claim for intentional infliction of emotional distress, Chehade must demonstrate that the ECFMG's conduct was "extreme and outrageous;" i.e., conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bound of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *See Twyman,* 855 S.W.2d at 621.  Simply put, there is no evidence in the record of any such conduct on the part of the ECFMG.  Accordingly, the ECFMG is entitled to summary judgment on this claim.

### 6. Civil RICO Claim

In his March 29, 1999 original complaint and his April 24, 2000 amended complaint,

respectively, Chehade characterized the ECFMG's conduct as "racketeer influenced with the purpose of retaliation" and "[r]acketeering and using their influences." **Pl.'s Orig. Compl. at 1; Pl.'s Am. Compl. at 1.** The Court construes these allegations to allege a civil RICO claim.

The RICO statute, 18 U.S.C. § 1964(c), creates a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir. 2000) (quoting *Beck v. Prupis,* 529 U.S. 494 (2000). Any RICO claim necessitates proof of (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise. *Crowe v. Henry,* 43 F.3d 198, 204 (5th Cir. 1995). The Fifth Circuit has clarified that a "person" named as a defendant in a RICO claim "must be one that either poses or has posed a continuous threat of engaging in acts of racketeering." *Id.* Racketeering activity, in turn, is defined in RICO to mean "'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses.'" *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 232 (1989) (quoting 18 U.S.C. § 1961(1) (1982 ed., Supp. V)).

Chehade has provided no competent summary judgment proof that the ECFMG is a "person" that poses or has posed a continuous threat of engaging in racketeering activity. Moreover, aside from the vague allegations in his response, see Pl.'s Resp. at 11 (¶ 14), Chehade sets forth no evidence of any cognizable acts of racketeering activity. Chehade, therefore, cannot establish the essential elements of his RICO claim, thus summary judgment is warranted.

### 7. Antitrust Violations

With no detailed factual support, Chehade also accuses the ECFMG of antitrust violations. **Pl.'s Am. Compl. at 2 (¶ IV).** However, in his amended complaint and his summary judgment

22

response, he has indicated that he wants to prosecute those claims in a different place at a different time. **Id.; Pl.'s Resp. at 3 (¶ 11).** Accordingly, the Court considers these claims abandoned and they will be dismissed.

### 8. Discrimination and Retaliation/Due Process Claims[6]

Chehade has also alleged that the ECFMG's conduct violated his Fourteenth Amendment due process guarantees and constitutes unlawful discrimination and retaliation based on his age, race, ethnic background, national origin, and citizenship status.[7] **Pl.'s Am. Compl., filed Apr. 24, 2000 at ¶ III (p. 2); Pl.'s Resp. to Magisrate's Questionnaire at 6.** The ECFMG contends that summary judgment is proper on these claims because there is no evidence of state action. **Def.'s Br. at 36-40.** The Court agrees.

To state a claim under 42 U.S.C. § 1983, a plaintiff must alleged facts which show (1) that he has been deprived of a right secured by the Constitution and the laws of the United States; and (2) the deprivation occurred under color of state law. **Flagg Bros., Inc. v. Brooks,** 436 U.S. 149, 155 (1978); **Bass v. Parkwood Hosp.,** 180 F.3d 234, 241 (5th Cir. 1999). Similarly, "because the Fourteenth Amendment protects liberty and property interests only against invasion by the state, a section 1983 plaintiff alleging the deprivation of Due Process under the Fourteenth Amendment must also show that state action caused his injury." **Bass,** 180 F.3d at 241. Regardless of whether

---

[6] These claims are discussed together since the ECFMG's asserted basis for summary judgment applies equally to both.

[7] In a pleading entitled "plaintiff's responses to the defendants original response and their motion for more definite statement," filed November 18, 1999, Chehade makes reference to Title VII in connection with his discrimination and retaliation claims. **Pl.'s Resp. to Def.'s Orig. Resp. at 2 (¶ 3).** There is no evidence, however, that Chehade was employed by or ever sought employment with the ECFMG, therefore, Title VII has no applicability here. Nonetheless, the Court will assume, as does the ECFMG, that Chehade's discrimination and retaliation claims are brought pursuant to 42 U.S.C. § 1983.

23

the challenged action is characterized as "state action" or action "under color of state law," the applicable legal standards are the same *See Lugar v. Edmondson* Oil Co., Inc., 457 U.S. 922, 935 (1982) ("If the challenged conduct constitutes state action [for purposes of the 14th Amendment], then that conduct was also action under color of state law and will support a suit under § 1983."). Thus, the threshold inquiry in any § 1983 action is whether there was any intentional involvement of a state actor. *Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir.), *cert. denied*, 510 U.S. 821 (1993).

There is no dispute that the ECFMG is a private organization. Private action, however, may be viewed as state action but only where the challenged conduct may be "fairly attributable to the State." *Lugar*, 457 U.S. at 937; *Bass*, 180 F.3d at 241. This fair attribution test has two components:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible ... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

*Bass*, 180 F.3d at 241 (quoting *Lugar*, 102 S.Ct. at 2753-54). As noted by the Fifth Circuit in *Bass*, the Supreme Court has employed several different formulas to determine whether seemingly private conduct may be recast as state action. *Id.* at 241-42 (citing *Lugar* as setting forth a public function test, state compulsion test, nexus test, and joint action tests). In general, a private entity's conduct may be charged to the state (1) "when that entity performs a function which is traditionally the exclusive province of the state;" (2) "when [the State] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law

be deemed to be that of the State;" or (3) when the government has "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Id.* at 242 (citations and internal quotations omitted).

In the instant case, Chehade points to no evidence permitting the conclusion under any of these three theories that the ECFMG's conduct may be fairly attributable to the State. The ECFMG's work - assessing and certifying whether foreign medical school graduates are qualified to enter into residency programs - does not fall within the narrow set of functions which have been classified as exclusively within the province of the State. *Staudinger v. Educ. Comm'n For Foreign Medical Graduates,* No. 92 Civ. 8071, 1993 WL 138954 at * 4 (S.D.N.Y. Apr. 28, 1993) (Freeh, J.); *See Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 624-25 (1991) (jury selection); *Terry v. Adams,* 345 U.S. 461, 468-70 (1953) (primary elections); *Marsh v. Alabama,* 326 U.S. 501, 507-09 (1946) (all municipal functions). And while it may be said that the ECFMG performs a "public function" with respect to the screening of foreign medical school graduates, courts have consistently held that this fact alone does not make a private entity, such as the ECFMG, a state actor. *See Rendell-Baker v. Kohn,* 102 S.Ct. 2764, 2772 (1982) (while education of "maladjusted high school students" is a "public function, ... that is only the beginning of the inquiry."); *See also Langston v. ACT,* 890 F.2d 380, 384-85 (11th Cir. 1989) (private organization does not become state actor by "tak[ing] on public function" of administering college entrance exam); *Johnson v. Educ. Testing Serv.,* 754 F.2d 20, 25 (1st Cir.) ("formulation, grading, and reporting" of standardized tests does not constitute "exclusive public function"), *cert. denied,* 105 S.Ct. 3504 (1985). Rather, the determining factor is whether the ECFMG performs a function which is traditionally performed solely by the State. *See Staudinger,* 1993 WL

138954 at * 5. That is not the case here.

Moreover, Chehade proffers no evidence that the State has exercised its coercive power over the ECFMG or encouraged the ECFMG's decisions. The ECFMG is not funded by or through the governments of the United States or the State of Texas. **Def.'s App. at 3 (Kelly Aff. at ¶ 9).** Additionally, although conceivably some state entities or universities may rely on the ECFMG's certification decisions, such reliance does not convert the ECFMG's conduct into state action. **Staudinger,** 1993 WL 138954 at * 5; **See Langston,** 890 F.2d at 285 ("**The reliance of state institutions on the validity of test results is not enough to convert ACT's security measures into state action.**"). "The state's mere acquiescence in private conduct, even where authorized by statute, will not transform that conduct into state action." **Bass,** 180 F.3d at 242 (**citing Flagg Bros.,** 98 S.Ct. at 1737-38)).

Likewise, Chehade fails to set forth any competent proof that the government has involved itself with the ECFMG in a joint enterprise. Despite his allegations of a conspiracy between the ECFMG and UTSW to deny him a residency slot, there is simply no proof in the record to support his claim. Accordingly, as Chehade cannot demonstrate the necessary state action, the ECFMG is entitled to summary judgment on his discrimination, retaliation, and Fourteenth Amendment due process claims brought pursuant to § 1983.

State action, however, is not required for discrimination claims brought pursuant to § 1981.[8] See 42 U.S.C. § 1981 (c); **Jackson v. Dallas Indep. Sch. Dist.,** No. Civ. A. 3:98-CV-1079-D,

_____

[8] 42 U.S.C. § 1981 guarantees that all persons "shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." **42 U.S.C. § 1981(a) (West 1994).**

1998 WL 386158 at * 2 (N.D. Tex. July 2, 1998) (Fitzwater, J.). Nevertheless, the record in this case is totally devoid of any evidence that the ECFMG engaged in racial discrimination prohibited by § 1981. Consequently, to the extent Chehade intends to bring his discrimination and retaliation claims under this section, summary judgment is also proper.

### 9. Other Constitutional Claims

Chehade has also alleged in his pleadings that the ECFMG's conduct amounts to slavery, and that it violates Title VI and Title IX. **Pl.'s Am. Compl., filed Apr. 24, 2000 at ¶ III (p. 2) and Pl.'s Resp. to Def.'s Orig. Resp. and Their Mot. for More Definite Statement, filed Nov. 18, 1999 at ¶ 3 (p. 2).**

Chehade's slavery claim is governed by 42 U.S.C. § 1994. Section 1994 was promulgated to implement the Thirteenth Amendment which abolished slavery. *Lonsdale v. Egger,* **525 F. Supp. 610, 612 (N.D. Tex. 1981)** (citing *U.S. v. Reynolds,* 235 U.S. 133 (1914)). As best the Court can tell, Chehade's slavery claim is premised on his belief that the ECFMG controls the residency positions in the United States, and that their conduct has enslaved him by preventing him from finding a job. The ECFMG has brought forth competent evidence that it has no control over who is accepted into the residency programs throughout the United States. **Def.'s App. at 12 (*Kelly Aff.* at ¶¶ 40-41), 14 (¶ 50).** It does not set the admissions criteria or the number of available positions. **Id. (¶¶ 40, 50).** Rather, the ECFMG only communicates with residency programs when asked by those programs to verify a particular applicant's certification. **Id. at 10 (*Kelly Aff.* at ¶ 35).** Moreover, the ECFMG's proof demonstrates that they had no knowledge of any residency applications submitted by Chehade nor any record of an inquiry from a residency program concerning Chehade's certification. **Def.'s App. at 11-12 (*Kelly Aff.* at ¶¶ 39-41).** In sum, there are simply

27

no specific facts alleged or evidence presented to support Chehade's slavery claim, therefore, summary judgment must be granted on this claim.

Title VI, 42 U.S.C. § 2000d *et seq.*, generally prohibits federally funded educational programs from subjecting individuals to discrimination based on their race, color, or national origin. *See GI Forum, Image de Tejas v. Texas Educ. Agency,* 87 F. Supp.2d 667, 677 (W.D. Tex. 2000); *See also* 34 C.F.R. § 100.3. Similarly, Title IX, 20 U.S.C. § 1681 *et seq.*, prohibits discrimination on the basis of sex in federally funded educational programs. *Barnett v. Texas Wrestling Ass'n,* 16 F. Supp.2d 690, 694 (N.D. Tex. 1998).

Both Title VI and Title IX are, by their express language, applicable only to institutions that receive federal financial assistance. 20 U.S.C. § 1681(a) (West 2000); 42 U.S.C. § 2000d (West 1994). It is undisputed that the ECFMG receives no such assistance. **Def.'s App. at 3** (*Kelly Aff. at ¶ 9*). Moreover, Chehade has pointed to no authority, and the Court has found none, that the ECFMG may be subject to liability merely because Chehade attempted to enroll in a federally funded educational institution following his receipt of a ECFMG certificate. Because the ECFMG cannot be held liable under Titles VI or IX for any alleged discrimination, summary judgment on these claims is warranted.

## V. Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **GRANTED.**

SO ORDERED,

January 4th, 2001.

JANE J. BOYLE
UNITED STATES MAGISTRATE JUDGE